UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PORT CARGO SERVICES, LLC, ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 22-1018** |
| **WESTCHESTER SURPLUS LINES INSURANCE COMPANY** | **SECTION "B"(1)** |

ORDER AND REASONS

Before the Court are defendant Westchester Surplus Lines Insurance Company's motion to dismiss (Rec. Doc. 5), plaintiffs Port Cargo Services, LLC and Burnside Plantation, LLC's opposition (Rec. Doc. 10), and defendant's reply (Rec. Doc. 13). After careful consideration,

**IT IS ORDERED** that defendant's motion to dismiss (Rec. Doc. 5) is **GRANTED**.

I.   FACTS AND PROCEDURAL HISTORY

This lawsuit arises out of an alleged breach of contract and duty of good faith from the denial of insurance claims for business interruption losses and extra expenses due to the coronavirus ("COVID-19") pandemic. Rec. Doc. 1-1 at 23-24 (plaintiffs' petition). Plaintiffs Port Cargo Services, LLC ("Port Cargo") and Burnside Plantation, LLC ("Burnside Plantation") (collectively, "plaintiffs") sought declaratory relief to establish coverage. *Id.* at 23. After plaintiffs' March 16, 2022 state court filing, defendant Westchester Surplus Lines Insurance Company

1

("Westchester" or "defendant") timely removed the case to federal court. Rec. Doc. 1. The Court accepts the following factual allegations as true for purposes of this motion to dismiss.

On March 1, 2020, defendant issued a commercial property insurance policy to plaintiffs for the period of one year. Rec. Doc. 5-2 at 3 (insurance policy). The policy covered plaintiffs' commercial properties, including various warehouses and the Houmas House. *Id.* at 7. Operating as a tourist destination, the Houmas House Plantation and Gardens manages a restaurant, bed-and-breakfast, and event space. Rec. Doc. 1-1 at 1 ¶ 2. Due to the COVID-19 pandemic, plaintiffs suffered "tremendous financial losses." *Id.* at 1 ¶ 3.

Plaintiffs' insurance policy covered "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." Rec. Doc. 5-2 at 11. One type of covered loss is "the actual loss of Business Income" from "direct physical loss of or damage to property" that results in a suspension of business operations. *Id.* at 27. Additionally, the policy included coverage for extra expense incurred due to the direct physical loss of or damage to the property. *Id.* Both the loss of business income and the extra expense applied to "the period of restoration," beginning "(1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or (2) Immediately after the time of direct physical loss or damage

2

for Extra Expense Coverage." *Id.* at 35. The period of restoration concluded on "(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location." *Id.* The policy did not specifically define "direct physical loss or damage." Rec. Doc. 1-1 at 17, ¶ 99. Further, the policy did not carve out a coverage exception for virus-related business suspensions. *See id.* at 19, ¶ 118.

Plaintiffs' policy also provided coverage for lost business income and necessary extra expenses resulting from actions of civil authorities. Rec. Doc. 5-2 at 28. This policy provision applies when both:

> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage . . . and (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* Governmental orders prevented plaintiffs from "using its [sic] insured properties to conduct its ordinary business activities and deprived Plaintiffs of its properties and the functionality of its properties." Rec. Doc. 1-1 at 4, ¶ 17.

Without specific epidemiological data, plaintiffs allege their properties experienced "the presence, statistically certain presence, or suspected presence" of COVID-19. *Id.* at 3 ¶ 16. Passed

3

from viral droplets, COVID-19 placed plaintiffs' properties at risk by "remain[ing] active and dangerous in the air in properties and on common surfaces." *Id.* at 7, ¶ 39. The presence of such droplets on the plaintiffs' property required "repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, removal of fomites by certified technicians, and other measures." *Id.* at 11, ¶ 57. In addition to extra expenses from decontamination measures, plaintiffs experienced commercial limitations, with COVID-19 "transforming property from usable and safe into a property that is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans." *Id.* Plaintiffs have not been reimbursed for their "hundreds of thousands of dollars in loss and damage." *Id.* at 2, ¶ 9.

## II.  LAW AND ANALYSIS

### A. 12(b)(6) Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's complaint "must contain enough facts to state a claim to relief that is plausible on its face." *Varela v. Gonzalez*, 773 F.3d 704, 707 (5th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotes omitted)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). However, the court is not bound to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). *A fortiori*, a complaint may be dismissed when it appears "beyond a doubt that plaintiff can prove no set of facts" that would entitle him to prevail. *Twombly*, 550 U.S. at 560–61; *First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.*, 178 F. Supp. 3d 390, 399 (E.D. La. 2016). However, the Fifth Circuit has stated that motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are "viewed with disfavor and [are]...rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

In its evaluation of a 12(b)(6) motion, the court is "cabined to the facts alleged in the complaint." *Jackson v. City of Hearne, Texas*, 959 F.3d 194, 198 (5th Cir. 2020). However, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-

5

*Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *see also Maloney Gaming Mgmt., L.L.C. v. St. Tammany Par.*, 456 F. App'x 336, 340 (5th Cir. 2011) ("[A] court may consider documents outside the complaint when they are: (1) attached to the motion; (2) referenced in the complaint; and (3) central to the plaintiff's claims."). A document is central to a claim if its attachment "merely assists the plaintiff in establishing the basis of the suit." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). The Fifth Circuit has considered insurance contracts attached to 12(b)(6) motions when central to a claim. *See, e.g., In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Little v. USAA Cas. Ins. Co.*, No. 09-30948, 2010 WL 4909869, at *2 (5th Cir. Apr. 2, 2010).

In this case, the Court may consider the insurance policy attached to defendant's motion to dismiss. Rec. Doc. 5-2. Plaintiffs specifically referenced the insurance policy on eighteen of its twenty-five pages. *Id.* at 1 ¶ 1; 2 ¶¶ 9-10; 3 ¶¶ 12, 14, 16; 4 ¶¶ 17-19, 23; 5 ¶ 28; 12 ¶ 59; 13 ¶ 67; 14 ¶¶ 77-78; 15 ¶ 84; 16 ¶¶ 89-97; 17 ¶¶ 98-99; 18 ¶ 111; 19 ¶¶ 113-114, 116-118; 20 ¶¶ 120-121, 123-124; 21 ¶¶ 127, 130, 133; 22 ¶ 138; 23 ¶¶ 140-141, 143, 146; 24 ¶¶ 148, 150, 25. In their introduction of the claim, plaintiffs centered their argument on the contents of the policy: "Defendant promised to pay for, in exchange for

6

premiums paid, physical loss of or damage to and related business interruption losses and expenses under an 'all risk' insurance policy." *Id.* at 1 ¶ 1. The insurance policy is both referenced by the plaintiffs' petition and central to their claim.

### B. Louisiana insurance contract standard

This matter comes before the Court through diversity jurisdiction under 28 U.S.C. § 1332. In a diversity case, state substantive law is applied. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Interpretation of an insurance policy is a matter of substantive law. *See Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).

Under Louisiana law, an insurance policy is "construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). "The words of a contract must be given their generally prevailing meaning." La. Civ. Code art. 2047. Contractual words, however, may "have acquired a technical meaning." *Cadwallader*, 848 So. 2d at 580. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. More specifically, words within an insurance policy "are not read in isolation," but as part of the greater document. *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009).

7

When policy provisions are ambiguous, they "are generally construed against the insurer and in favor of coverage." *Cadwallader*, 848 So. 2d at 580. Even so, ambiguous insurance provisions must be "susceptible to two or more reasonable interpretations." *Carrier v. Reliance Ins. Co.*, 759 So. 2d 37, 43 (La. 2000). Generally, the interpretation of insurance contract provisions involves a question of law. *Bonin v. Westport Ins. Corp.*, 930 So. 2d 906, 910 (La. 2006). "The burden rests with the insured to prove that an insurance policy covers a particular claim." *IberiaBank Corp. v. Illinois Union Ins. Co.*, 953 F.3d 339, 346 (5th Cir. 2020) (applying Louisiana law).

### C. *Erie* guesses remain

Though instructive, Louisiana law does not answer the precise issue before this Court. In determining Louisiana law, federal courts sitting in diversity first "look to the final decisions of the Louisiana Supreme Court." *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206. Lacking one, courts make an *Erie* guess. *Id.* (determining "in our best judgment, how that court would resolve the issue if presented with the same case"); *see also Transcon. Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992) ("[I]t is the duty of the federal court to determine as best it can, what the highest court of the state would decide."). In this case, the Louisiana Supreme Court has not ruled on COVID-19's applicability as a cause of direct physical loss or

8

damage. *See* Rec. Doc. 10 at 9 (plaintiffs' response); Rec. Doc. 13 at 2 (defendant's reply).

In making an *Erie* guess, Louisiana's unique civilian principles demand first "examining primary sources of law: the State's Constitution, codes, and statutes." *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 175 (5th Cir. 1999). The body of Louisiana appellate court decisions remain a secondary source, "even when it rises to the level of *jurisprudence constante*." *Id*. Though not controlling, such Louisiana opinions "should be given some weight." *Labiche v. Legal Sec. Life Ins. Co.*, 31 F.3d 350, 351–52 (5th Cir. 1994); *see also Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) (Louisiana appellate decisions providing a "datum for ascertaining state law"). State appellate opinions carry greater authority when they provide a final judgment on the matter. *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 238 (1940). Still, a federal court should not disregard appellate opinions, "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Howe ex rel. Howe*, 204 F.3d at 627 (internal quotation omitted). The Fifth Circuit has found persuasive data from "consult[ing] a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (applying Louisiana law); *see also Centennial Ins. Co. v.*

9

*Ryder Truck Rental, Inc.*, 149 F.3d 378, 382 (5th Cir. 1998) (collecting possible data sources). With *Erie* guesses, federal courts "must attempt to predict state law, not to create or modify it." *United Parcel Serv., Inc. v. Weben Indus., Inc.*, 794 F.2d 1005, 1008 (5th Cir. 1986).

### D. COVID-19 as direct physical loss or damage

Aside from one state appellate court decision, jurisprudence applying Louisiana law is consistent: COVID-19 does not present direct physical loss or damage so as to trigger insurance policy provisions for lost business income or necessary extra expense. *See, e.g., Q Clothier New Orleans, L.L.C.*, 29 F.4th at 258; *Coleman E. Adler & Sons, LLC v. Axis Surplus Ins. Co.*, No. 21-648, 2021 WL 2476867, at *2 (E.D. La. June 17, 2021); *Louisiana Bone & Joint Clinic*, 2022 WL 910345 at *2; *Grand Isle Partners, LLC v. Assurant*, No. 21-505, 2022 WL 179467, at *5 (E.D. La. Jan. 20, 2022); *but see Cajun Conti LLC*, 2022 WL 2154863 at *16-17.

In *Q Clothier New Orleans LLC v. Twin City Fire Ins. Co.*, this Court refused to broadly construe "direct physical loss or damage," finding COVID-19 inapplicable even if the policy had contained no virus exception. 535 F. Supp. 3d 574, 583 (E.D. La. 2021). On appeal, the Fifth Circuit affirmed our ruling in every respect. *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252 (5th Cir. 2022). The federal appellate court held that "direct physical loss or damage" has an unambiguous

10

meaning in Louisiana law. *Id.* at 258-59. Namely, "the plain and ordinary meaning of 'physical loss of or damage to property' is a tangible alteration to, injury to, or deprivation of property." *Id.* at 260. Though the Louisiana Supreme Court has not explicitly defined the term, the Fifth Circuit determined state appellate courts have accepted that "the ordinary and generally-accepted meaning of 'loss' is 'destruction, ruin, or deprivation.'" *Id.* at 258 (quotation omitted). Further, interpretations of insurance policies in Louisiana and Texas are substantially similar, making a recent Fifth Circuit application of Texas law on the question pertinent. *Id.* (discussing *Terry Black's Barbecue, L.L.C. v. State Automobile Mutual Insurance Co.*, 22 F.4th 450, 458 (5th Cir. 2022) (holding "'physical loss of property' to mean a tangible alteration or deprivation of property")).

Finally, the Fifth Circuit distinguished two cases that found direct physical loss or damage involving lead dust and noxious drywall. *Id.* at 258-60. One such case was *Widder v. Louisiana Citizens Property Ins. Corp.*, 82 So. 3d 294 (La. Ct. App. 2011). Though differing from a dented bumper or caved ceiling, the *Widder* court held lead dust and drywall fumes rendered the insured's property "unusable or uninhabitable and therefore qualified as a direct physical loss." *Q Clothier New Orleans,* 29 F.4th at 258 (discussing *Widder*, 82 So. 3d at 296). Thus, the Circuit determined the threshold inquiry was whether from a direct physical cause,

11

the plaintiff's property was required to be removed and replaced. *See Q Clothier New Orleans,* 29 F.4th at 259. As COVID-19's presence did not require such reconstruction, the Fifth Circuit found that the pandemic failed as a cause of direct physical loss or damage. *Id.*

Four months after *Q Clothier*, the Louisiana Fourth Circuit Court of Appeal took a different tack. *Cajun Conti LLC*, 2022 WL 2154863 at *16-17. In *Cajun Conti*, the state appellate court reversed a bench trial judgment that COVID-19 was not a cause of direct physical loss of or damage to insured property. *Id.* at *1. The Fourth Circuit did not reach the question of direct physical loss or damage, instead basing its reasoning on policy ambiguity. *Id.* at *3. As the policy did not define "direct physical loss" or "damage" and the Court found no state opinion that definitively held the terms are not ambiguous, it reviewed the agreement for reasonable interpretations. *Id.* at *4-5. In its view, the reasoning in *Widder v. Louisiana Citizens Prop. Ins. Corp.* provided "conceptual commonalities" for COVID-19 application. *Id.* at 4.

The state appellate court observed two policy ambiguities. *Id.* at *5-7. First, it reasoned that loss of the property could reasonably mean either loss of full functionality or full loss of property use. *Id.* *5-6. Second, the court found the type of "repair" envisioned by the policy could reasonably mean either "the wholesale and permanent repair of physical objects" or "some

12

portion of the cycle of cleaning and decontamination . . . restoring the property to a healthy state." *Id.* at *7. With ambiguity established, the court construed the provisions in favor of the insured, extending coverage for contamination from COVID-19. *Id.* at *8.

The *Cajun Conti* opinion, however, was not rendered without dissent. *Id.* at *8-10 (Belsome, J., dissenting). Judge Belsome, the author of the *Widder* opinion, maintained that the majority's discovery of policy ambiguities ran counter to previous decisions. *Id.* at *9. Simply, the opinion's reliance on lead dust and gaseous fume cases was "misplaced because in those cases the courts found a physical alteration of the insured's property that rendered the property uninhabitable or useless, which did not occur in this case." *Id*. Further, though federal cases are not binding on the state appellate court, Judge Belsome found their "sound reasoning" persuasive that business interruption provisions contain no ambiguity when applied to Louisiana COVID-19 claims. *Id.* at *8.

In this case, plaintiffs' petition fails to plausibly state a claim under the theory that COVID-19 caused direct physical loss or damage. While lacking the assurance of a Louisiana Supreme Court opinion, we believe the highest state court would reject plaintiffs' contention that policy provisions are ambiguous so as to establish coverage. *See Transcon. Gas Pipe Line Corp.*, 953 F.2d at 988.

13

Our *Erie* guess is primarily based on Louisiana statutory provisions for contractual interpretation. In Louisiana, words in insurance policies are given their ordinary meaning, as informed by their context within the policy as a whole. *See* La. Civ. Code art. 2047; La. Rev. Stat. § 22:881. Though "direct physical loss of or damage to property" is not defined in the instant policy, Rec. Doc. 1-1 at 17, ¶ 99, mere absence of a definition does not create ambiguity of meaning. *Am. Deposit Ins. Co. v. Myles*, 783 So. 2d 1282, 1287 (La. 2001).

Our understanding of the term's meaning tracks the policy's statements on "the period of restoration." *See* Rec. Doc. 5-2 at 35. When plaintiffs suffer direct physical loss of or damage to insured property, coverage extends to "the necessary suspension of your operations during the period of restoration." *Id.* at 27 (internal quotations omitted). This period is defined in the policy by way of its beginning and end. *Id.* at 35. The ending of the period of restoration occurs on "(1) The date when the property at the described premises should be *repaired, rebuilt or replaced* with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location." *Id.* (emphasis added). When read together, the alternative endings offer only one reasonable interpretation: coverage extends when the property has experienced physical loss or damage so as to make it wholly or partially unusable.

14

Further, the triad "repaired, rebuilt or replaced" only deepens the sense that the envisioned loss or damage requires a type of reconstruction. In the context of this policy and in its ordinary use, "repaired" does not mean mere exterior "cleaning" or "sanitization." Placed alongside "rebuilt" and "replaced," "repaired" here indicates a physical reconstruction similar to but lesser than the other descriptives. The ordinary meaning is even clearer. No one would call for a cleaning service when a repairman is required. Black's Law Dictionary reinforces this common sense, defining "repair" as "[t]he process of restoring something that has been subjected to decay, waste, injury, or partial destruction, dilapidation, etc." Black's Law Dictionary (11th ed. 2019). With repair unambiguously requiring a physical reconstruction, COVID-19 cannot be found as the cause of direct physical loss or damage.

Though statutory interpretation and the plain reading of the policy text lead to a firm conclusion against coverage, we also are persuaded by the weight of jurisprudence. Until *Cajun Conti*, cases applying Louisiana law to similar facts have uniformly found no coverage. *See, e.g., Q Clothier New Orleans, L.L.C.*, 29 F.4th at 258; *Coleman E. Adler & Sons, LLC v. Axis Surplus Ins. Co.*, No. 21-648, 2021 WL 2476867, at *2 (E.D. La. June 17, 2021); *Louisiana Bone & Joint Clinic*, 2022 WL 910345 at *2; *Grand Isle Partners, LLC v. Assurant*, No. 21-505, 2022 WL 179467, at *5 (E.D. La. Jan. 20, 2022). These denials of coverage are in concert with cases

15

that found coverage from lead dust and drywall fumes. *See Widder*, 82 So. 3d at 296; *In re Chinese Man. Drywall Prods. Liab. Litig.*, 759 F. Supp. 2d at 831–32. The Louisiana Fourth Circuit decision in *Widder* explained the reasoning by tying uninhabitability to reconstruction and replacement. *See Widder*, 82 So. 3d at 296 ("Ms. Widder's home is contaminated with inorganic lead which makes it uninhabitable until it has been gutted and remediated."); *see also Ross v. C. Adams Const. & Design, L.L.C.*, 70 So. 3d 949, 952 (La. Ct. App. 2011) ("[T]he inherent qualities of the Chinese drywall did create a physical loss to the home and required that the drywall be removed and replaced.").

Finally, *Cajun Conti* does not change our view of how the Louisiana Supreme Court would rule on the issue. Significantly, the freshly decided case is not a final judgment, with a request for retrial currently pending. *See* Rec. Doc. 13 at 2. The persuasive data already cited convince us that the many previous decisions are on solid footing. This Court concurs with the Fifth Circuit that "the Louisiana Supreme Court would interpret 'direct physical loss of or damage to property' to cover only tangible alterations of, injuries to, and deprivations of property." *Q Clothier New Orleans, L.L.C.*, 29 F.4th at 257. One swallow does not a summer make, nor does one case application make Louisiana law. Plaintiffs' petition fails to make a plausible claim for

16

coverage through COVID-19 as cause of direct physical loss of or damage to property.

**E. Civil Authority coverage**

Plaintiffs' petition also fails to make a plausible claim for coverage through civil authority provisions. For coverage from actions by civil authorities, the policy envisions circumstances when "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage." Rec. Doc. 5-2 at 28. The Fifth Circuit has described this coverage as "a nexus between any prior property damage and the evacuation order." *Dickie Brennan & Co., Inc. v. Lexington Ins. Co.*, 636 F.3d 683, 686 (5th Cir. 2011) (denying coverage to Louisiana business from hurricane evacuation order). Plaintiffs cite no specific order they believe triggered such coverage. *See* Rec. Doc. 1-1 at 9; Rec. Doc. 10 at 20-23. Further, no COVID-19 order was directed to property damage. *Q Clothier New Orleans, L.L.C.*, 29 F.4th at 260 ("The Governor's orders, for example, cited the need to mitigate the spread and impact of COVID-19 in the state.").

Moreover, plaintiffs were never "prohibited by civil authority" to access their properties. The Fifth Circuit has recognized the meaning of "prohibit" as "to forbid by authority or command." *730 Bienville Partners, Ltd. v. Assurance Co. of America*, 67 F. App'x 248, 2003 WL 21145725, at *2 (5th Cir. 2003). Thus,

17

COVID-19 orders would need to establish "complete prohibition of access" to trigger civil authority coverage. *Lafayette Bone & Joint Clinic, Inc. v. Transportation Insurance Co.*, No. 6:21-CV-003172021, WL 1740466, at *4 (W.D. La. May 3, 2021). However, in Louisiana, "even the most stringent governmental orders did not completely forbid access to [insured] premises." *St. Tammany Par. Hosp. Serv. Dist. No. 2 v. Zurich Am. Insurancy Co.*, No. 21-2204, 2022 WL 860416, at *12 (E.D. La. Mar. 23, 2022). As such, plaintiffs fail to state a claim through civil authority provisions.

### F. Breach of contract, breach of the duty of good faith, and declaratory relief

Not establishing plausible policy coverage, plaintiffs' specific remedies, in turn, fail. In Louisiana, "the essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Denham Homes, L.L.C. v. Teche Federal Bank*, 182 So. 3d 108, 119 (La. Ct. App. 2015) (internal citation omitted). Here, we have found no plausible obligation on the part of Westchester.

Further, to establish a breach of the duty of good faith in an insurance denial, the insured "must first have a valid, underlying, substantive claim upon which insurance coverage is

18

based." *Clausen v. Fidelity and Deposit Co. of Maryland*, 660 So. 2d 83, 85, (La. Ct. App. 1995), *writ denied* 666 So. 2d 320 (La. 1996). More specifically, "breach of contract is a condition precedent to recovery for the breach of the duty of good faith." *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 363 (5th Cir. 2010) (applying Louisiana law). With no breach of insurance contract here, plaintiffs are unable to prove a breach of the duty of good faith.

Finally, plaintiffs' request for declaratory relief also fails. Judgments for declaratory relief provide a civil procedure through which a court can establish a plaintiff's rights. La. Code Civ. Proc. Art. 1871. Here, plaintiffs assert eleven bases for declaratory relief. Rec. Doc. 1-1 at 22 ¶ 138. All relief sought either reference plaintiffs' theory that COVID-19 caused direct physical loss or damage to insured property or make general policy restatements. Regarding the latter, the Court declines to rule on any specific policy restatements. Civ. Proc. Art. 1876. All claims for relief related to plaintiffs' breach of contract claims, however, are denied, for the reasons stated previously.

New Orleans, Louisiana this 17th day of August, 2022

_____
SENIOR UNITED STATES DISTRICT JUDGE